James A. CLINE

v.

ROCKINGHAM COUNTY SUPERIOR COURT, EXETER, NEW HAMPSHIRE.

Civ. A. No. 73–135.

United States District Court,
D. New Hampshire.

Dec. 6, 1973.

Richard S. Kohn, American Civil Liberties Union of N. H., Vincent P. Dunn, Maynard, Dunn & Phillips, Concord, N. H., for plaintiff.

Robert V. Johnson, II, Asst. Atty. Gen., of N. H., for defendant.

## OPINION

BOWNES, District Judge.

This petition for writ of habeas corpus involves First Amendment overbreadth and vagueness challenges to New Hampshire's flag desecration statute. The statute, NH RSA 573:2, reads in pertinent part:

> No person shall . . . annex or affix . . . to any . . . flag . . . any inscription, design, device, symbol, name, advertisement, words, marks, or notice whatever, or exhibit or display . . . any such flag . . . .

The facts have been stipulated:

1. On July 29, 1970 at 6:35 p. m., James A. Cline was arrested at Hampton Beach, New Hampshire, by Officer Donald McNutt, Jr., of the Hampton Police Department, who observed him with a blanket draped over his shoulder. The blanket had an American flag attached to it upon which a peace symbol had been penned in ink. (Tr. p. 5)

2. On September 10, 1970, a complaint was brought against the defendant in the Hampton District Court charging that the defendant did:

> "Affix a symbol to a flag of the United States of America to wit: did display a flag of the United States of America when said flag had a peace symbol drawn on said flag and did cause this said flag to be displayed in public." (Reserved Case p. 2)

3. Petitioner pled "not guilty." He was found guilty after trial by the Court and sentenced to pay a fifty dollar fine.

4. Petitioner appealed for a trial de novo in the Rockingham County Superior Court.

5. On October 6, 1971, the date of trial at Rockingham County Superior Court, petitioner filed a motion to dismiss on the ground that RSA 573:2 was void for vagueness and in violation of the First Amendment. On the same date, the Court denied the motion.

6. On October 6, 1971, petitioner was found guilty after trial by jury and was sentenced to pay a fine of twenty-five dollars and was also sentenced to the House of Correction for a period of three days. Sentence was stayed pending appeal to the New Hampshire Supreme Court.

7. On November 1, 1971, petitioner filed a motion to vacate sentence on the ground that the imposition of a greater sentence than that imposed in the District Court violated the defendant's constitutional right to appeal. The motion was denied on November 4, 1971.

8. On May 31, 1973, the New Hampshire Supreme Court upheld the constitutionality of RSA 573:2 and overruled petitioner's exceptions.

9. On June 7, 1973, the Rockingham County Superior Court granted a stay of execution of his sentence pending disposition of proceedings in the United States District Court for the District of New Hampshire.

10. When Officer McNutt arrested the petitioner, the latter did not show any contempt towards the flag. (Tr. p. 14)

11. At the time of the arrest, the petitioner complied with the officer's directions (Tr. p. 15) and was a civil young man. (Tr. p. 14)

12. The sole reason for the arrest was that the petitioner had a peace symbol on a flag. (Tr. p. 15)

13. At the time of the County Court trial, the petitioner was living in Nashua, New Hampshire, with his parents. (Tr. p. 16) He was a senior at the Wilton High School and was captain of the cross-country track team. (Tr. p. 16) He was eighteen years of age (Tr. p. 16) and was starting to work at the drop-in center in Nashua with youths who had drug problems or other kinds of personal problems. (Tr. p. 17)

14. Following his arrest and having been advised of his *Miranda* rights (Tr. p. 5), petitioner admitted to Officer McNutt that he had drawn the peace symbol on the flag with ballpoint ink. (Tr. p. 6)

15. Petitioner testified that he put the peace symbol on the flag "As a protest against war, the war in Vietnam, personally." (Tr. p. 17)

16. Petitioner was of draft age, was registered for the draft (Tr. p. 18), and was "against any war and specifically against the war in Vietnam." (Tr. p. 17)

17. Petitioner testified that his intent in placing the peace symbol on the flag "was to symbolize peace and American justice." "To symbolize—you know —to put together a symbol for peace; a symbol for America as a protest for the Vietnam war." (Tr. p. 18)

18. Petitioner also testified that "I respect the flag as a symbol standing for the United States." (Tr. p. 18)

19. Petitioner further testified that he did not intend to mutilate the flag (Tr. p. 18), that if he had wanted to he probably would have burned it (Tr. pp. 18–19), and that he never had the intention of holding the flag up to contempt. (Tr. p. 19)

20. Petitioner testified that he was vaguely aware that putting the symbol on the flag was against the law. (Tr. p. 19)

21. Officer McNutt testified that he had encountered other young people at Hampton Beach with flags and symbols on their attire. He had seen some "wearing just the American flag and some with flags that really weren't American flags—they had the peace symbol where the stars and blue background is." (Tr. p. 8)

### THE LAW

After the decision of the New Hampshire Supreme Court upholding the statute and his conviction, petitioner filed a writ of habeas corpus claiming that he was illegally arrested and convicted in violation of his rights under the First and Fourteenth Amendments to the United States Constitution in that RSA 573:2 is unconstitutional on its face and as applied to him, because it violates the right to freedom of speech guaranteed by the First Amendment to the United States Constitution and it violates the right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution in that it is overly broad, impermissibly vague and incapable of air [sic] and reasonable interpretation by public officials.

Jurisdiction rests on 28 U.S.C. §§ 2241 and 2254.[1]

Petitioner challenges NH RSA 573:2 as unconstitutional because it impermissibly interferes with his First Amendment freedom of speech. He maintains that the New Hampshire statute is both overvague and overbroad. However, since I rule that the statute is overbroad, it will not be necessary to consider the vagueness challenge.

The First Circuit, in Goguen v. Smith, 471 F.2d 88 (1st Cir. 1972), probable jurisdiction noted, 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 969 and oral argument heard, 42 L.W. 3303 (Nov. 20, 1973), has recently set forth guidelines to be followed in this type of overbreadth challenge.

In the context of a federal habeas corpus proceeding a state criminal statute should not be ruled unconstitutional on its face as overbroad unless (1) the area affected by it includes a large proportion of First Amendment activities, (2) it possesses the potential for a substantial number of impermissible applications, and (3) immediate and effective excision of the statute's impermissible applications is not foreseeable without continued interruptions of First Amendment freedoms. Goguen v. Smith, *supra*, 471 F.2d at 98.

My first inquiry then is "whether this flag desecration law affects an area of interests which includes a substantial

1. Although petitioner has remained at large pending the outcome of this action, he is "in custody" within the meaning of the federal habeas corpus statute. Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed. 2d 294 (1973).

proportion of First Amendment activities." *Goguen, supra,* 471 F.2d at 98. The state maintains that the petitioner was not attempting to communicate any ideas by his conduct and that if he was trying to express himself, his ideas were so "nebulous, ambiguous, and not susceptible to general understanding" that they are not entitled to First Amendment protection. State's Brief at 6–8. On the other hand, petitioner's testimony demonstrates that he intended his action to symbolize "a protest against war, the war in Vietnam" and "peace and American justice." Transcript at 17–18.

It is too late now to deny "that the flag has a meaning—a very special meaning." *Goguen, supra,* 471 F.2d at 99. "Throughout our history as a nation the flag has been our symbol . . . . " Joyce v. United States, 147 U.S.App.D.C. 128, 454 F.2d 971, 975 (D.C.Cir.1971), cert. denied, 405 U. S. 969, 92 S.Ct. 1188, 31 L.Ed.2d 242 (1972). From its inception, it has symbolized protest against, as well as support for, our national goals. "[I]t says everything and is big enough to symbolize the variant viewpoints of a Dr. Spock and a General Westmoreland." Parker v. Morgan, 322 F.Supp. 585, 588 (W.D.N.C.1971). For these reasons, the flag *is* "always 'saying' something." *But see* Parker v. Morgan, *supra,* at 588. "If it did not speak by itself as a symbol of the United States of America, [I] doubt that any state would have sought to protect its message from verbal or physical abuse." *Goguen, supra,* 471 F. 2d at 99.

The New Hampshire statute does then affect conduct which embodies communicative content. Although the statute is precisely drawn, it casts a shadow over a substantial field of protest activity. *Goguen, supra,* 471 F.2d at 99–100.

Having decided that the New Hampshire statute does affect a large area of First Amendment activities, I must next determine whether the statute impermissibly restricts those activities. I start with the premise that "many types of flag usage and flag alteration . . . are a . . . means of nonverbal political communication." Long Island Vietnam Moratorium Committee v. Cahn, 437 F.2d 344, 349 (2nd Cir. 1970), United States appeal pending, 42 U.S.L. W. 3016 (July 10, 1973); Thoms v. Smith, 334 F.Supp. 1203, 1208 (D.Conn. 1971), affm'd., 473 F.2d 478 (2nd Cir. 1973). Such communicative activity has always been accorded First Amendment protection. Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L. Ed.2d 731 (1969); Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L. Ed. 1117 (1931). I agree with the courts in Thoms v. Smith, 334 F.Supp. 1203 (D.Conn.1971), and Crosson v. Silver, 319 F.Supp. 1084 (D.Ariz.1970), that "it is self-evident that most, if not all, conduct associated with the United States flag is symbolic speech." [2] *Crosson,* 319 F.Supp. at 1086, *Thoms,* 334 F.Supp. at 1208.

Although symbolic speech does not enjoy the comprehensive protection afforded pure speech,[3] its regulation

---

2. The court in Hodsdon v. Buckson, 310 F. Supp. 528 (D.Del.1970), took "judicial notice of the symbolic significance of flying the American flag." 310 F.Supp. at 533.

3. When an object is a "pure symbol, such as the flag in *Halter,* [Halter v. Nebraska, 205 U.S. 34, 27 S.Ct. 419, 51 L.Ed. 696] the cross, the Star of David, the crescent, the swastika, the hammer and sickle, the red flag in Stromberg v. California, . . . or black armband in *Tinker,* any individualized activity with regard to it outside of the purely logistical activity of maintaining or storing of it is bound to convey a message

of fealty or revulsion and is 'closely akin to pure speech.' " *Goguen, supra,* 471 F.2d at 99; *see* Hodsdon v. Buckson, 310 F.Supp. 528, 533 (D.Del.1970). In this regard it may be appropriate to test the State's regulation against the more rigorous standards applicable to governmental interference with pure speech. *See* Street v. New York, 394 U.S. 576, 616, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1968) (Fortas, J., dissenting), and *cf.* Cantwell v. Connecticut, 310 U.S. 296, 303–304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Nevertheless, I apply the more lenient *O'Brien* test "with the realization that if the statute cannot meet those standards for constitu-

must be justified by a state interest other than suppression of free speech and any restrictions must be directed to the nonspeech elements of the activity. Four specific standards for evaluating a state regulation of symbolic speech were set out by the Supreme Court in United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

1. The regulation must be "within the constitutional power of the Government,"

2. The regulation must "further an important or substantial governmental interest,"

3. The governmental interest must be "unrelated to the suppression of free expression," and

4. "[T]he incidental restriction on alleged First Amendment freedoms [must be] no greater than is essential to the furtherance of that interest."

In addition, the Supreme Court has indicated that there are a limited number of governmental interests which can justify regulation of First Amendment activities in circumstances similar to these. Those governmental interests are:

(1) an interest in deterring appellant from vocally inciting others to commit unlawful acts; (2) an interest in preventing appellant from uttering words so inflammatory that they would provoke others to retaliate physically against him, thereby causing a breach of the peace; (3) an interest in protecting the sensibilities of passers-by who might be shocked by appellant's words about the American flag; and (4) an interest in assuring that appellant, regardless of the impact of his words upon others, showed proper respect for our national emblem. Street v. New York, 394 U.S. 576, 591, 89 S.Ct. 1354, 1365, 22 L. Ed.2d 572 (1968).

Although Street involved a limitation on pure speech, I adopt the Court's circum-

scription of possible governmental interests in that case as applicable here. *Vietnam Moratorium, supra,* 437 F.2d at 349; *Thoms, supra; Crosson, supra.*

While the New Hampshire Supreme Court considered that New Hampshire's interest in preserving the "pristine purity" of the flag provided a constitutional basis satisfactory in the light of the *O'Brien* standards, the State has also argued that the *O'Brien* requirements are satisfied by the State's interest in preventing breaches of the peace. Practically speaking, the former is a declaration of the State's interest in the protection of the physical integrity of the flag. Thus, with the exception of the third interest mentioned in *Street,* the State has attempted to justify NH RSA 573:2 via all those interests "which might conceivably have been furthered by punishing [petitioner]." *Street, supra,* 394 U.S. at 591–592, 89 S.Ct. at 1365. I will examine both bases separately under the *O'Brien* standards.

*New Hampshire's Interest in Protecting the Physical Integrity of the Flag*

■ I turn first to the question of whether New Hampshire has the constitutional power to protect the physical integrity of the flag. Earlier Supreme Court cases and a number of lower federal and state court cases have taken the view that a state does have an interest in preserving the physical integrity of the flag. Halter v. Nebraska, 205 U.S. 34, 27 S.Ct. 419, 51 L.Ed. 696 (1907); Hoffman v. United States, D.C.App., 256 A.2d 567 (1969); State v. Cline, N.H., 305 A.2d 673 (filed May 31, 1973); and *see* Goguen v. Smith, 471 F.2d 100 and 100 nn. 18–19.

However, the more recent Supreme Court cases and some lower federal decisions lend authority to the position that "there is no important state interest in protecting the physical integrity of the flag." *Goguen, supra,* 471 F.2d at 102 n. 24. West Virginia State Board of

---

tionality, it is *a fortiori* unconstitutional if viewed as affecting pure speech." *Goguen, supra,* 471 F.2d 100 n. 18. *See* State v.

Cline, N.H., 305 A.2d 673 (filed May 31, 1973).

Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), stands for the premise that a state may not punish "failure to act affirmatively in a gesture of support for the flag." *Goguen, supra,* 471 F.2d at 101. In *Street,* the Supreme Court, drawing support from *Barnette,* held that verbal abuse of the flag was not punishable. In refusing to uphold *Street's* conviction on the theory that he "failed to show respect for our national symbol," the Court said:

> We have no doubt that the constitutionally guaranteed "freedom to be intellectually . . . diverse or even contrary," and the "right to differ as to things that touch the heart of the existing order," encompass the freedom to express publicly one's opinions about our flag, including those opinions which are defiant or contemptuous. *Street, supra,* 394 U.S. at 593, 89 S.Ct. at 1366.

Although *Street* dealt with pure speech, the Court's rationale is applicable here.[4]

> If verbal abuse of the flag cannot be proscribed in an effort to encourage respect for our national symbol, then [I] fail to understand how physical abuse which is visually communicative, the archetype situation which the [New Hampshire] statute reaches, can similarly be forbidden on these nationalistic grounds. *Goguen, supra,* 471 F.2d at 101.

This position is supported by Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1968). In *Tinker,* the Court upheld high school students' rights to protest the Vietnam War by wearing black arm bands to school. Expression of similar views using the national flag should be given at least the same freedom. Other lower federal courts which have dealt with the flag desecration issue have reached this conclusion. Although the statutes examined are not exactly the same as NH RSA 573:2, the curtailment of First Amendment activities and the governmental interests involved are precisely analogous. *See Vietnam Moratorium, supra,* 437 F. 2d at 349; *Crosson, supra,* 319 F.Supp. at 1087–1088; *Thoms, supra,* 334 F.Supp. at 1210–1211.

In summary, then, I believe

> . . . that the rationales of *Barnette* and *Stromberg* together compel the conclusion that the punishment of peaceful symbolic acts rejecting the political ideas bespoken by the flag is as alien to the mandate of the First Amendment as is compulsion to signify adherence. That this staute proceeds, heedless of the guarantees of that amendment, to proscribe such acts determines its invalidity. Hodsdon v. Buckson, 310 F.Supp. 528, 535 (D.Ariz.1970).

Having failed to satisfy the first *O'Brien* standard, it is apparent that New Hampshire's interest in preserving the physical integrity of the flag cannot justify the statute's effect on First Amendment activities. Moreover, even if New Hampshire did have such an interest, NH RSA 573:2 could not thereby be justified; for such an interest would not satisfy the third *O'Brien* standard because it is *not* "unrelated to the suppression of free expression."

*New Hampshire's Interest in Preventing Breaches of the Peace*

It is the State's contention that NH RSA 573:2 can be justified on the basis that there is a state interest in preventing breaches of the peace. In terms of the *O'Brien* test, the first three steps of the analysis are easily satisfied.

> Obviously . . . a state does have a valid interest in prohibiting conduct which will incite others to commit unlawful acts or provoke retaliatory actions amounting to a breach of the peace.

and

> . . . there can be no doubt that the broad [New Hampshire] statute furthers that substantial or important

4. *See* Thoms v. Smith, 334 F.Supp. 1203, 1209 (D.Conn.1971).

government interest. *Goguen, supra,* 471 F.2d at 102.

Moreover, unlike the Massachusetts statute in *Goguen,* it must be conceded that the enforcement of this statute for the purpose of preserving the peace is "unrelated to the suppression of free expression." *O'Brien, supra,* 391 U.S. at 377, 88 S.Ct. at 1679. Thus, if NH RSA 573:2 cannot be justified by New Hampshire's interest in preventing breaches of the peace, it must be because the fourth and last step in the *O'Brien* analysis is not satisfied.

The final *O'Brien* standard regulates against overbreadth in otherwise permissible state regulations of First Amendment activities. As the Court in *Goguen* said:

> Since experience has demonstrated the propriety of imposing some restrictions on the exercise of First Amendment rights where substantial government interests are at stake, Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951), it is of utmost importance that these incidental burdens be no greater than is essential to the furtherance of those interests. *Goguen, supra,* 471 F.2d at 103.

The evil that this standard seeks to avoid is that of a statute which fairly prohibits unlawful conduct, but, at the same time, sweeps under its proscription a wide range of protected First Amendment activities. The question then is: Is the New Hampshire statute "carefully drawn so as not to unduly impair liberty of expression"? Chaplinsky v. New Hampshire, 315 U.S. 568, 574, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942).

█ While the New Hampshire statute is not as broad as some of the recently invalidated statutes, it is not so narrowly drawn "as to include within its prohibition only those types of flag desecration which per se are likely to cause breaches of the peace." *Crosson, supra,* 319 F.Supp. 1084, 1088. Unlike other statutes which have been judicially scrutinized, *see e. g.* the statute in *Crosson, supra,* NH RSA 573:2 is not limited to "public" desecration. On oral argument, the State admitted that the statute would apply to a totally private act of sewing a symbol on a flag. Such an act, committed, for instance, in the privacy of one's home, could not possibly provoke a breach of the peace. Additionally, there are acts of desecration covered by NH RSA 573:2 which clearly would not "incite onlookers to commit unlawful acts or provoke others to retaliate and thereby cause a breach of the peace." [5] *Thoms, supra,* 334 F.Supp. 1203, 1209. Since it is not drawn narrowly enough to regulate only that conduct which would result in violence,[6] the New Hampshire statute authorizes prosecution of First Amendment activity by local law enforcement officials in circum-

---

5. Interestingly enough, the *Crosson* court, in declaring Arizona's flag desecration statute unconstitutional in 1970, discussed a hypothetical situation very close to the one with which I am presented in this case. The court had this to say:

> It is clear that when a person places on his automobile windshield a flag decal with a peace sign superimposed thereon, he has, in his effort at symbolically expressing his conception of what the flag should stand for, also "defaced" a "representation * * * purporting to be the flag * * * of the United States. * * *" Such an act violates [the statute] and exposes the actor to criminal punishment. Yet we cannot conceive that such an act is likely to provoke the average citizen to angry retaliation. *Crosson, supra,* 319 F.Supp. at 1089.

6. In People v. Radich, 26 N.Y.2d 114, 308 N.Y.S.2d 846, 257 N.E.2d 30 (1970), affirmed *per curiam* 401 U.S. 531, 91 S.Ct. 1217, 28 L.Ed.2d 287 (1971), the New York Court of Appeals upheld the conviction of an art dealer who displayed sculpture portraying the flag in a "contemptuous" manner. However, the Court felt that the defendant's conduct amounted to inciting a breach of the peace. The Supreme Court's *per curiam* affirmance, by an equally divided vote, suggests only that "a state may properly prohibit public flag defilement (of the nonspeech variety) *which threatens a breach of the public peace." Thoms, supra,* 334 F. Supp. at 1210.

Moreover, the Court in *Radich* did not discuss the *O'Brien* requirement that the restrictions on First Amendment activities be no greater than necessary.

stances where New Hampshire has no valid interest in the prohibition of the activity. *Thoms, supra,* 334 F.Supp. at 1210. I agree with the First Circuit in *Goguen* that

> . . . in the nebulous realm of symbolic speech there is truth in the statement that "the medium is the message" and to suppress the medium is to censor the message [citing cases], especially where it is being conveyed through a passive form of expression. *Goguen, supra,* 471 F.2d at 104.

Although its nature and direction have changed throughout our history, protest has always been an integral theme in the development of our nation's conscience. Symbolic activities having communicative content are an important part of that protest heritage. Absent danger to the health, safety, or welfare of the public, these activities must not be suppressed, even when they are offensive to or critical of the prevailing points of view. And this is especially so where the protest is aimed at the Government. People v. Radich, 26 N.Y.2d 114, 308 N.Y.S.2d 849, 257 N.E.2d 30, 37 (1970) (dissenting opinion of Fuld, C. J.), affm'd. 401 U.S. 531, 91 S.Ct. 1217, 28 L.Ed.2d 287 (1971). Criticism of the Government should be allowed the widest latitude except under very extraordinary and specified conditions.

The last step in the *Goguen* guidelines requires consideration of two questions: (1) whether the statute can be given "some limiting construction" and/or (2) whether it is "foreseeable" that the New Hampshire courts would constitutionally limit the application of the law. *Goguen, supra,* 471 F.2d at 104. This inquiry leads me through the same analysis rendered in *Goguen.* Without repeating that analysis here, I note that the statute's infirmity cannot be corrected by a simple excision, *see Street, supra,* nor can I authoritatively construe

this statute, where, as here, the "state courts have adopted an 'all or nothing' attitude." *Goguen, supra,* 471 F.2d at 104.

> The advance illimitable threat of criminal sanction which the flag desecration law poses to constitutionally-protected rights of others who may forego those rights can . . . be eliminated only by [my] timely decision. *Goguen, supra,* 471 F.2d at 104.

■ Although the constitutional infirmities already discussed invalidate petitioner's conviction, a final issue merits attention. As used in NH RSA 573:2, the term "flag" refers to NH RSA 573:1, which defines a "flag" as

> . . . the national flag, or . . . any flag, standard, color, or ensign of the United States, or . . . the flag of this state, or . . . any state flag or ensign of any other state, or . . . any flag or ensign evidently purporting to be either of said flags, standards, colors or ensigns. NH RSA 573:1

Because it incorporates the definition in Section 1, NH RSA 573:2 purports to regulate

> . . . on its face all kinds of posters, buttons, symbols, slogans, and emblems such as have been used for many years in election campaigns, patriotic movements, and so forth. *Vietnam Moratorium, supra,* 437 F.2d at 348.

Without attempting an in-depth analysis, it can easily be seen that NH RSA 573:2, when read in light of NH RSA 573:1, is unconstitutionally overbroad.[7] *See Vietnam Moratorium, supra,* 437 F. 2d at 344.

For the foregoing reasons, the writ of habeas corpus will issue after the time for appeal by the State of New Hampshire has elapsed.

So ordered.

---

7. This point was neither briefed nor argued. On the question of petitioner's standing to raise the issue, *see* Goguen v. Smith, 471 F. 2d 88 (1st Cir. 1972).